**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JAMES HICKSON,                          )        CASE NO. 1:09-CV-940
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )        MAGISTRATE JUDGE VECCHIARELLI
                                        )
MICHAEL J. ASTRUE,                      )
   Commissioner of Social Security      )
                                        )        **MEMORANDUM OPINION**
          Defendant.                    )        **AND ORDER**

     Plaintiff James Hickson challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue ("Commissioner"), denying his claim for Supplemental

Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416(I), 423 *et seq.*

(the "Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties entered under the authority of 28 U.S.C. § 636(c)(2).

     For the reasons set forth below, the Court AFFIRMS the final decision of the

Commissioner.

## I.   PROCEDURAL HISTORY

Hickson applied for SSI on May 26, 2005.  (Tr. 84-86.)  The Commissioner denied his claim initially and on reconsideration.  Hickson filed a request for an administrative hearing.

On August 18, 2008, Administrative Law Judge Dennis R. Greene ( "ALJ") held a hearing on Hickson's claims.  Hickson was represented by counsel.  He, as well as two medical experts, Drs. James McKenna and Dr. Kathleen O'Brien, and a vocational expert, Michelle Peters, testified at the hearing.  On September 2, 2008,  the ALJ found that Mr. Hickson was not under a "disability" as defined by the Act.

This decision became the final decision of the Commissioner when the Appeals Council denied further review.  Hickson filed an appeal to this court.

On appeal, Hickson claims: (1) the ALJ failed to fully and fairly evaluate the evidence with regard to Hickson's physical limitations and did not properly assess his subjective complaints of pain; and (2) the ALJ failed to fully and fairly evaluate the evidence with regard to Hickson's mental limitations.

## II. EVIDENCE

### A.      Vocational History and Claimant Testimony

In August 2008, Hickson testified at the hearing in the presence of his attorney. (Tr. 747.)  He completed eighth grade and was 45 years old at the time of the hearing. (Tr. 167, 649, 749- 50.)  Hickson previously worked as a beverage runner, banquet set-up man, laundry worker, and driver/deliverer. (Tr. 756-58.)  Hickson went to prison from October 2007 to April 2008 for receiving stolen property (Tr. 753) and from 1993 to

2

1996 for passing bad checks (Tr. 754). Hickson lived at a homeless shelter "on and off"

since 2005 because he lacked income.  (Tr. 751, 753.)  He did volunteer work there

during the days. (Tr. 752.)  The shelter did not provide mental health treatment to

Hickson. (Tr. 753.)  Hickson testified he last used alcohol, marijuana, and

cocaine in February 2007. (Tr. 771-72.)  Hickson began using a cane after his last

surgery and could not walk without it. (Tr. 785.).  Hickson claimed he could sit or stand

for about twenty minutes.  (Tr. 785.)  Hickson testified that he needed to lay on his back

for about fifteen to thirty minutes roughly six times per day.  (Tr. 785.)

### B.    Physical Impairments

In June 2005, Hickson complained of right-sided tingling, weakness, and

numbness. A physical exam did not reveal significant abnormalities (Tr. 305).  The next

month, Hickson noted right-leg and bilateral hand numbness.  Hickson had normal gait.

(Tr. 306.)   He raised similar complaints on July 7, 2005 and August 5, 2005.  (Tr. 306-

08.)

On July 15, 2005, internal medicine physician Dr. Franklin Krause conducted a

consultative physical exam. (Tr. 315-21.)   Hickson complained of back discomfort and

numbness in his right leg.  (Tr.  316.)  Hickson's right-hand grip was "excellent." (Tr.

315.)  He had no ambulatory aides, and, after a few steps, Hickson's gait was

unremarkable.  (Tr. 316.)  A lumbar spine x-ray showed no evidence of fracture or

spondylolisthesis, and Hickson had a full range of motion. (Tr. 314, 316.)

A few months later, Hickson complained of right-leg and bilateral hand numbness

(Tr. 374).  Hickson had normal shoulder, elbow, wrist, finger, hand, and knee strength

(Tr. 375). Hickson limped on the right leg (Tr. 375), but during a follow-up exam a few

3

weeks later, Hickson ambulated without difficulty (Tr. 380).

In September 2005, a cervical spine MRI showed: (a) mild central stenosis at the C3-4 level; (b) marked central canal stenosis and cord compression at the C4-5-6 levels; (c) mild central disc protrusion at the C6-7 level; and (d) a mass in the nasopharynx. (Tr. 273.)  The next month, an otolaryngologist diagnosed the nasopharynx mass to be benign and no further treatment was warranted.  (Tr. 381-82, 384-85).  An MRI of the lumbar spine showed no overall canal stenosis or disk abnormalities. (Tr. 404.)

In December 2005, neurosurgeon Dr. Verrees performed a C5-6 anterior cervical fusion surgery with no complications.  (Tr. 393-95.)

The following month, Hickson complained of posterior neck pain and pain between the shoulder blades.  Hickson had normal upper and lower extremity muscle strength and normal gait. (Tr. 396.)  A cervical spine x-ray showed good alignment and position of the plate (Tr. 396).  It was noted that Hickson continued to take Percocet three times per day.  (Tr. 396.)

In February 2006, Hickson said that he was "doing a lot better" with his walking and his hands felt less numb.  (Tr. 711.)  Hickson had steady gait and 5/5 motor strength.  (Tr. 711.)

The next month, Hickson's had steady gait and had smoother movement since before surgery.  (Tr. 708.)  However, Hickson complained of some numbness and weakness on his right side, but stated that it had improved since surgery.  Hickson was advised to continue with physical and occupational therapy.  (Tr. 708.)

On July 23, 2006, Hickson visited the emergency room ("ER") after experiencing

4

a fall.  He complained of diffuse right-side pain. (Tr. 701.)  He showed no gross motor or sensory deficits and had good bilateral grip strength. (Tr. 702.)  Twelve hours prior to his ER arrival, Hickson spoke with a resident in the middle of the night and demanded narcotic pain medications. (Tr. 702.)   The resident told Hickson that he could get no more narcotics without an evaluation and suspected drug-seeking behavior.  (Tr. 702.)  During his ER stay, Hickson admitted to using marijuana, heroin, and cocaine that day.  (Tr. 702.)  A cervical spine CT and thoracic and lumbosacral spine CT showed no acute fracture or subluxation.  (Tr. 685, 687.)  It also revealed multi-level spinal canal stenosis in the mid-thoracic spine. (Tr. 687.)

Five days later, Hickson visited the neurology department at MetroHealth Medical Center.  He reported that subsequent to his neck fusion, he had been doing okay until March 2006 when he walked off a step and started having pain in the right side of his back to his right leg.   An examination revealed decreased strength in the hip flexor and the knee extensor.  It was noted that Hickson's right leg feels different to the touch.  Hickson's gait was described as walking slowly with a limp.  Hickson's right lower extremity was swollen, most likely from minimum movement due to pain.  (Tr. 683-84.)

In July 2006, state agency reviewing physician Dr. Cho assessed Hickson's physical residual functional capacity ("RFC").  (Tr. 416-23.)  Dr. Cho found that Hickson could: lift fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit for about six hours in and eight-hour workday; and push and pull an unlimited amount.  (Tr. 417.)  Dr. Cho opined that Hickson could balance only occasionally. (Tr. 418-19.)

On August 21, 2006, Hickson underwent an MRI of his lumbar spin, which

revealed mild to moderate canal stenosis at the lower limits of normal in size and an overgrowth of the apophyseal joints.  (Tr. 662.)  Hickson also underwent an MRI of his thoracic spine on August 23, 2006, which revealed stenosis between T7, T10, T12, and T4.

On September 11, 2006, Hickson had a CT myelogram performed, which revealed extensive thoracic developmental/degenerative stenosis with canal compromise and cord compression between T7 and T10, significant cord compression, and middle to moderate lumbar stenosis at the L3-4 and L4-5 levels.  (Tr. 646.)

On September 15,  2006, Hickson underwent a T3, T4, T7, and T10 laminectomy and thoracic decompression. (Tr. 640-42.)

In October 2006, Hickson had a neurological exam and consultation with Dr. Verrees. (Tr. 592.)  Hickson was "walking pretty good," but his left leg hurt.  (Tr. 597.)  Hickson's mid-back pain had resolved since his September 2006 thoracic decompression. (Tr. 597.)  Hickson had 5/5 motor strength and intact sensation. (Tr. 597.)  Dr. Verrees noted that Hickson was doing "quite well" and neurologically he was intact. (Tr. 598.)  Hickson was in physical therapy and stated that he lost his cane, so Dr. Verrees prescribed another one for him.  (Tr. 597.)  Hickson told Dr. Verrees that he was going to visit his mother for a week in Virginia, and Dr. Verrees prescribed Percocet for the trip. (Tr. 597.)  She noted that they should "not give him any more medications." (Tr. 598.)

In early December 2006, Hickson visited Dr. Verrees. (Tr. 592.)  He stated that his right leg was better and stronger, but his left leg was still weak and numb. (Tr. 592.)  Hickson did not mention difficulty traveling to visit his mother. (Tr. 592.)  An MRI of the

6

thoracic spine showed that the three levels of the thoracic spine that were decompressed in September looked very good and open.  (Tr. 592, 594.)  Upon exam, Hickson had 5/5 motor strength throughout and his sensation was grossly intact. (Tr. 593.)  Hickson's gait was steady and, while he walked with a cane, he did not lean heavily on it.  (Tr. 592.)  Throughout the exam, Hickson told jokes and seemed to have a fine time. He did not exhibit signs of being in pain. (Tr. 593.)  Dr. Verrees noted that Hickson was "doing rather well and was neurologically intact." (Tr. 593.)

    Later that month, Hickson complained of numbness in his left leg.  Exam revealed a steady gait with Hickson slightly favoring his left leg. (Tr. 292.)  Near the end of December 2006, Hickson asked for more pain medication (Tr. 586).  He stated that his prescription for Percocet was sent to the nursing home but he had been out of that nursing home.  (Tr. 586.)  He was prescribed Vicodin for one month only.  (Tr. 586.)  A few days later, Hickson visited the ER and reported that he had lost his prescription in the past and was requesting pain medication. (Tr. 583.)  Hickson was given a prescription for Percocet (Tr. 584).

    In January 2007, Hickson visited the ER for back pain.  (Tr. 573.)  His back was assessed with no abnormalities.  (Tr. 573.)  Hickson stated that he was having some pain and swelling, but he had no obvious signs of injury or swelling.  (Tr. 574.)

    On February 2, 2007, Hickson visited the ER, complaining of left lower extremity pain and numbness, left groin pain and numbness, and a flare-up of his thoracic back pain that radiated to the left side of his chest.  (Tr. 525-26.)

    A few days later, Hickson visited physical medicine physician Dr. Tran complaining of severe chronic pain since his thoracic surgery. (Tr. 517.)  He reported

7

constant level 10/10 pain. (Tr. 517.)  Dr. Tran prescribed Percocet, Flexeril, and Naprosyn and informed Hickson that his pain medications would be prescribed by one provider and he may be subject to random drug screening.  (Tr. 519.)

On February 8, 2007, Hickson visited the ER  and stated that he used crack-cocaine three days prior.  (Tr. 507.)  He reported getting kicked out of his residence and preferred to stay in the hospital overnight.  (Tr. 507.)

The next month, pain medicine physician Dr. Tabbaa performed a pulse mode branch rhizotomy at the left L1, 2, and 3 levels. (Tr. 494.)  Hickson stated that he had run out of pain medications and tried to contact the pain management clinic for a refill. (Tr. 495.)  Dr. Tabbaa stated that he would give him thirty tablets only this time. (Tr. 495.)

In May 2007, Hickson visited the ER and was assessed with a mid-back strain (Tr. 491-92).  He was given Ibuprofen and Percocet before discharged.  (Tr. 492.)

In June 2007, Hickson went back to the ER for back pain. (Tr. 480.)  Hickson's muscle strength was 5/5. (Tr. 480.)   An ER doctor discharged him the same day and instructed to get further pain refills from Dr. Tran. (Tr. 481.)

In July 2007, Hickson complained of level 10/10 pain. (Tr. 471.)  Dr. Tran recommended switching pain medications to Robaxin and Percocet and suggested physical therapy. (Tr. 474.)

The following month, Hickson underwent a radio frequency rhizotomy at the right L3, L4, and L5 levels. (Tr. 468-69.)  Around the same time, Hickson stated that he ran out of his pain medications. (Tr. 469.)  Records revealed that Hickson received one hundred twenty Percocet tablets two weeks prior to that time and a new prescription

8

was not filled. (Tr. 469.)

In September 2007, Hickson reported a decrease in pain for about a week and half after his radio frequency rhizotomy.  He reported that his pain had returned and was made worse by sitting, standing, and walking.  Hickson's back showed normal range of motion and no negative findings.  Also, Hickson exhibited normal strength and sensation in all extremities.  (Tr. 466).

In June 2008, Hickson reported to the neurology department at MetroHealth Medical Center that hat he had been incarcerated in October 2007 and had been released recently. (Tr. 461.)  Hickson reported that he walked with a cane and fell frequently. (Tr. 462.)   It was noted that Hickson's gait was antalgic with a straight cane. (Tr. 464).  An examination revealed decreased sensation in the bilateral extremities. (Tr. 463.)  Hickson appeared to be "stable" on exam. (Tr. 464.)

### C.      Mental Health Treatment

In April 2005, Hickson underwent a probation screening exam with psychologist Dr. Franklin.  (Tr. 284-89).  Hickson reported a history of alcohol, marijuana, and cocaine use.  He noted that he last used marijuana and crack-cocaine the weekend prior to the interview and last drank alcohol "a few weeks ago." (Tr. 286.)  Hickson stated he had never been hospitalized in a psychiatric facility or prescribed psychotropic drugs. (Tr. 286.)  Dr. Franklin opined that Hickson suffered from major depressive disorder with psychotic features, cocaine dependence, and alcohol abuse.  (Tr. 288.)

On July 16, 2005, Hickson underwent a psychiatric evaluation.  (Tr. 309-13.) Hickson was diagnosed as bipolar II disorder – depressed and cluster B personality dysfunction. (Tr. 312.)

9

In August 2005, psychologist Dr. Felker interviewed Hickson at the request of the state agency. (Tr. 322-25.)  Hickson told Dr. Felker that he stopped using drugs seven years prior.  (Tr. 322).  Dr. Felker concluded that Hickson had a primary diagnosis of depression. (Tr. 324.)  She noted that Hickson demonstrated: mild restrictions in his ability to concentrate and attend to tasks; minimal to mild restrictions in his ability to relate to others and deal with the general public; and moderate restrictions in his ability to relate to work peers, supervisors, and to tolerate the stressors of employment.  (Tr. 324.)  Dr. Felker also said that Hickson's ability to understand and follow instructions was not impaired.  (Tr. 324).  She assessed a GAF score of 58.[1]

In September 2005, state agency reviewing psychologist Dr. Rudy assessed Plaintiff's mental RFC.  (Tr. 345-48.)  She assessed depressive disorder. (Tr. 352.) She also opined that Hickson had: mild limitations in activities of daily living; moderate limitations in maintaining social functioning; mild limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 359.)  Dr. Rudy noted that Hickson could have minor problems dealing with co-workers and supervisors and his insight and judgment were good. (Tr. 347.)  Also, she stated that Hickson would have some difficulty adjusting to changes in routine at times and his ability to handle

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A GAF score of 51-60 indicates some moderate symptoms like flat affect and circumstantial speech and occasional panic attacks or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 33-34 (American Psychiatric Association, 4th ed. Text rev. 2000)(DSM-IV-TR).

stress was moderately restricted. (Tr. 347).

In May 2006, Dr. Felker interviewed Hickson for a second time. (Tr. 410-13.)  Dr. Felker diagnosed chronic pain disorder, an unspecified mood disorder, and adult antisocial behavior. (Tr. 412.)  Dr. Felker opined that Hickson's ability to concentrate was mildly restricted; his capacity for carrying out tasks was moderately restricted due to depressive symptoms and chronic pain; his ability to relate to others and deal with the general public was at least moderately restricted; and his ability to work with peers and supervisors and tolerate the stress associated with employment was moderately to seriously restricted.  (Tr. 412.)  Dr. Felker assessed a GAF score of 53. (Tr. 413.)

In February 2007, Hickson underwent a psychiatric mental health assessment. (Tr. 500.)  He stated that he relapsed with drug and alcohol use a few days prior. (Tr. 500.)  He was diagnosed with substance induced mood disorder and was assessed a GAF score between 51 and 60. (Tr. 501.)  A few months later, state agency reviewing psychologist Dr. Tishler affirmed Dr. Rudy's September 2005 findings.  (Tr. 347, 349, 415.).  Dr. Tishler noted that Hickson was not credible due to his inconsistent statements regarding his substance abuse. (Tr. 415.)

### D.    Medical Expert Testimony

Internal medicine physician Dr. James McKenna testified as a medical expert at the hearing. (Tr. 763-769.)  Dr. McKenna noted that Hickson had been treated for discogenic and degenerative disorder of the cervical, thoracic, and lumbar spine. (Tr. 764.)  He explained that Hickson had scoliosis and congenital spinal stenosis that had been treated surgically by a laminectomy at T-2, T-3, T-6 and T-9. (Tr. 764.)  He also stated that Hickson had an interior infusion at C-5 and C-6. (Tr. 764).  Dr. McKenna

11

opined that Hickson would be limited to performing a reduced range of light work that allowed for no frequent, extreme neck movements and no frequent bending, stooping, twisting, and turning of the spine. (Tr. 764-65.)  He stated that Hickson was "otherwise functional." (Tr. 765).

Dr. McKenna acknowledged that Hickson consistently complained of pain. (Tr. 766.)  He testified that it was difficult to separate drug-seeking behavior from legitimate pain complaints from someone who has abused drugs. (Tr. 765).  He also noted that, "one doesn't need a significant impairment" but rather a "persistent allegation of pain to end up with surgery." (Tr. 767.)  He referenced Dr. Verrees's December 2006 notes showing that Hickson's pain did not appear to be a limiting factor. (Tr. 766, 768.)

Licensed clinical psychologist Dr. Kathleen M. O'Brien also testified as a medical expert at the hearing. (Tr. 769-77.)  Dr. O'Brien stated that, in the record, Hickson's disorder variably was described as bipolar disorder; however, it seemed to be considered mainly depression. (Tr. 773.)  She noted that Hickson was treated with Wellbutrin, which is an antidepressant, not a mood stabilizer. (Tr. 773.)  Dr. O'Brien noted no evidence of counseling. (Tr. 773.)  She also observed that the record after mid-2005 was "very sparse" in terms of how much treatment he actually had for this condition.

Dr. O'Brien testified that Dr. Felker essentially opined that Hickson suffered from a disorder that was largely due to his pain and his physical difficulty.  (Tr. 773.)  Dr. O'Brien opined that Hickson had mild limitations with activities of living; moderate restrictions with social interaction; moderate restrictions with concentration, persistence, and pace; and no evidence of decompensation episodes. (Tr. 775.)  She noted that, if

12

Hickson was using substances, his restrictions would be more marked. (Tr. 776.)  She also noted that Dr. Felker's finding that Hickson had moderate to severe limitations with dealing with work peers was probably because she was doing an assessment based upon Hickson's self-report. (Tr. 775.)  Dr. O'Brien also opined that Hickson did not meet the C criteria because Hickson was not restricted to living in the homeless shelter based on mental health symptoms. (Tr. 775.)

Dr. O'Brien testified that Hickson had not been honest about his substance abuse.  (Tr. 774.)  She pointed out that Hickson reported many years of sobriety, yet was diagnosed with polysubstance abuse in 2005 and relapsed with alcohol and drug abuse in 2007.  (Tr. 774.)

### E.    Vocational Expert Testimony

Michelle M. Peters testified as the vocational expert ("VE") at the hearing. (Tr. 777-84.) The VE testified that an individual with Hickson's vocational profile who could perform light work with occasional turning of the head, stooping, and twisting could perform: (a) assembly type positions, of which there would be approximately 550 positions; (b) inspection types of positions, of which there would be approximately 1000 positions; and (c) sorter positions, of which there would be approximately 650 positions. (Tr. 781.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable

13

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ found that Hickson has the severe impairments of discogenic and degenerative disorder of the cervical, thoracic, and lumbar spine, affective disorder and polysubstance dependence.  The ALJ determined that Hickson does not have an

14

impairment of combination of impairments that meets or medically equals one of the listed impairment sin 20 CFR Part 404, Subpart P, Appendix 1.   He further determined that if Hickson stopped his substance abuse, he would have the residual functional capacity to perform light work with only occasional neck movement, bending, stooping, twisting and turning.

The ALJ held that Hickson is unable to perform any past relevant work, but that there would be a significant number of jobs in the national economy that Hickson could perform if he stopped his substance abuse.  Finally, the ALJ determined that because Hickson would not be disabled if he stopped the substance use, his substance use disorders is a contributing factor material to the determination of disability.  Consequently, the ALJ found that Hickson has not been disabled under the Act.

## V.  STANDARD OF REVIEW

This Court's review is limited to determining whether substantial evidence exists in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

15

## VI.  ANALYSIS

### A.    Physical Impairments

Hickson first asserts that the ALJ failed to fairly and fully evaluate the symptoms resulting from his physical impairments.  Specifically, Hickson disputes the ALJ's assessment of pain symptoms.

Hickson takes issue with the ALJ's reliance on the testimony of non-examining ME, Dr. McKenna, who opined that Hickson should be limited to light work with a need to avoid frequent extreme neck movements, bending, stooping, twisting, and turning of the spine.  (Tr. 765.)

In *Richardson v. Perales*, 402 U.S. 389, 408 (1971), the Supreme Court held that it is acceptable for the ALJ to use a medical expert, because the expert's primary duty is to make complex medical cases understandable to the layman examiner.  Moreover, the medical expert can offer his own opinion regarding a claimant's condition. *See* 20 C.F.R. § 416.927(f)(2).  The ALJ can properly rely on the testimony of a non-examining medical expert in order to make sense of the record.  *See Buxton v. Halter*, 246 F.3d 762, 775 (6th  Cir. 2001).  In addition, an ALJ's reliance on the opinion of a non-examining medical expert is proper if the expert's opinion is based on objective reports and opinions. *See Barker v. Shalala*, 40 F.3d 789, 794-95 (6th Cir. 1994); *Loy v. Secretary of Health and Human Servs*, 901 F.2d 1306, 1308-09 (6th Cir. 2001).

In the instant case, Dr. McKenna's opinion regarding Hickson's physical limitations is consistent with the record as a whole.  Dr. McKenna identified Hickson's two prior spinal surgeries, as well as MRIs that showed that Hickson had significant cervical spinal stenosis.  Dr. McKenna testified, however, that Hickson's complaints of

pain were inconsistent with his physical presentation.  One  example that Dr. McKenna cited in support is an office visit in December 2006, where Hickson smiles, jokes, and shows no signs of being in pain.  (Tr. 764.)  The record further supports this opinion in that clinical findings, such as gait and strength, were repeatedly found to be normal (Tr. 306, 316, 380, 396, 708, 375, 396, 466, 480, 5933, 597, 702) and Hickson exhibited a full range of back motion (Tr. 316, 466).   Moreover, Hickson's treating physician, Dr. Verrees, noted that Hickson was doing well and was neurologically intact on multiple occasions.  (Tr. 598 and 598.)

While Hickson asserts that the ALJ should not have relied on Dr. McKenna's opinion that Hickson could perform light work with limitations described above, Hickson offers no medical evidence in support of an alternate finding nor even states what specifically the ALJ should have determined with regard to the RFC finding.  The only other medical opinions regarding physical limitations in the record are those of state agency physicians who make findings consistent with Dr. McKenna.  As such, the ALJ properly relied on Dr. McKenna's testimony.

Hickson also asserts that ALJ unreasonably rejected Hickson's allegations regarding his symptoms and limitations.  In evaluating a claimant's complaints of pain, the ALJ  may consider the claimant's credibility. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Kirk v. Sec'y of Health & Human Services*, 667 F.2d 524, 538 (6th  Cir. 1981).  In assessing the credibility of a witness, personal observations are important.  In fact, it is one of the reasons underlying the preference for live testimony. *See* 2 McCormick on Evidence § 245 at 94 (4th ed.1992); *cf. Ohio v. Roberts*, 448 U.S. 56, 63-64 (1980).  Thus, an ALJ who has observed a witness's demeanor

17

while testifying should be afforded deference when his credibility findings are assessed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir.2003); *Villarreal v. Sec'y of Health & Human Services*, 818 F.2d 461, 463 (6th Cir. 1987).  The court is not obliged to accept an ALJ's assessment of credibility if the finding is not supported by substantial evidence.  *Beavers v. Sec'y of Health, Educ. & Welfare,* 577 F.2d 383, 386-87 (6th Cir.1978).

Hickson asserts that the ALJ failed to find him credible based on two  "isolated emergency room visits."  (Doc. No. 15 at 14.)   The ALJ did rely on the records from the emergency room visits where Hickson reported pain, swelling, and numbness, yet did not physically present with any of these symptoms.  (Tr. 22, *see also* Tr. 573-74, 507.) These records alone demonstrate that Hickson is not fully credible when stating complaints of pain.

However, the ALJ further relied on additional reasons for finding Hickson not fully credible.  The ALJ cites numerous inconsistent statements to medical professionals and during his testimony, including: not mentioning difficulty in traveling despite reports that his left leg was weak and numb; claiming that the numbness in his left leg gets better when he walks, yet testifying that he is unable to walk; contradictory statements regarding his alcohol and polysubstance abuse – among them that he has not used drugs or alcohol, that he used drugs but quit in 1998, used drugs but quit in 2005, and used drugs but quit in 2007; and testifying that he could only sit for 20 minutes, but sitting for more than an hour during the hearing and testifying that he sat around the homeless shelter all day.   (Tr. 22.)

The ALJ clearly stated sufficient reasons based both on the medical evidence

18

and Hickson's testimony for finding Hickson less than fully credible.  As such, substantial evidence supports the ALJ's RFC finding with regard to Hickson's physical limitations.

### B.    Mental Limitations

Hickson asserts that the ALJ's failure to find mental limitations with regard to Hickson's RFC was not supported by substantial evidence.  Specifically, the ALJ found that absent substance abuse, Hickson was not functionally limited by his mental condition.

"Psychological (mental) problems are non-exertional impairments which must be included in the [Commissioner's] evaluation of a claimant's limitations." *Walker v. Bowen*, 834 F.2d 635, 642 (7th Cir. 1987).  "The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity." *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A) (2006)).  An alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. pt. 404, subpt. P. app. 1, § 12.00(B) (2006); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Hickson argues that two state agency psychologists found mild to moderate mental limitations that were not adopted by the ALJ in his RFC finding.  Dr. Felker opined that Hickson's capacity for carrying out tasks is moderately restricted; Hickson's ability to relate to others and the general public is moderately restricted; Hickson's ability to relate to work peers, supervisors, and tolerate the stresses associated with employment is moderately to severely impaired.  (Tr. 412.)  In addition, Dr. Felker

19

provided a GAF score 53 based on moderate restrictions in his occupational and social functioning.  (Tr. 413.)  Dr. O'Brien, the ME, testified that Hickson had mild difficulties with daily living, moderate difficulties with social interaction, and moderate difficulties with concentration, persistence, and pace.  (Tr. 775.)

The ALJ discussed O'Brien's opinion regarding limitations and referenced, although did not address at length, Dr. Felker's opinion.  However, the ALJ ultimately found that Hickson's claimed limitations in social functioning and maintaining concentration, persistence, and pace were contradicted by his own actions. Specifically, the ALJ cites the fact that Hickson stated that he facilitated groups at the homeless shelter where he lived and helped new people get situated.  The ALJ notes that if Hickson were as psychologically limited as he alleges, he would not be able to perform these functions.

While the ALJ did not provide an extensive discussion on this matter, he did cite substantial evidence in support of his finding that Hickson did not have functional mental limitations.  The court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See Raisor v. Schweiker*, 540 F.Supp. 686 (S.D. Ohio 1982).  In the instant action, the ALJ provided sufficient reason, namely the admitted capability of Hickson to function sufficiently in social situations, for not finding any mental functioning limitations in his RFC finding, absent substance abuse.  Thus, the ALJ's decision in this case is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Court finds the decision of the Commissioner is supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED  and judgment is entered in favor of the defendant

IT IS SO ORDERED.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 8, 2010